THE STATE OF WASHINGTON, *Respondent*, v. DAVEN NYSTA,
*Appellant*.

34

*Oliver R. Davis* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Dennis J. McCurdy, Deputy*, for respondent.

¶1 BECKER, J. — Invocation of the right to counsel and double jeopardy are the two principal issues raised in this appeal. First, during a custodial interrogation, police asked appellant Daven Nysta if he would take a polygraph test. Nysta said, "[S]hit man I gotta talk to my lawyer." Because this statement was an unequivocal invocation by Nysta of his right to an attorney, the interrogation should have stopped. The trial court erred by denying the motion to suppress the statements that followed. The error was harmless, however, because the statements that followed were no more incriminating than the statements that went before.

¶2 Second, Nysta claims his convictions for second degree rape and felony harassment were for the same offense because the same death threat that proved felony harassment might have also proved the forcible compulsion element of the rape. The State erroneously concedes a double jeopardy violation. Because the death threat was not necessary to prove forcible compulsion, the two crimes were not the same in law and fact.

## FACTS

¶3 The State proved two counts of rape and one count of felony threat through the testimony of SF, the victim. SF

testified that Nysta began a relationship with her in February 2009 and moved some of his possessions into her residence. When Nysta drank, he became aggressive and angry. He threatened to beat up SF if she ever cheated on him.

¶4 On the night of July 31, 2009, Nysta borrowed one of SF's cars. When he returned, the back window of the car was broken. SF told Nysta she wanted to break up. Nysta got angry and left.

¶5 SF heard a knocking at her door early the next morning. When she opened the door, Nysta pushed his way into the house. He appeared intoxicated. SF told Nysta their relationship was over and she had gone out with another man.

¶6 SF testified that Nysta grabbed her, threw her on a bed, and forced his fingers into her vagina and anus. When she tried to move off the bed, he kicked her in the face, began punching and biting her, and repeated the rape with his fingers. "He started asking me questions about who I was with and what we did. Any every time I answered him, he would hit me in the face or arms or anywhere." SF heard her infant daughter crying in the next room. Nysta kept up the violent assault, kicking, punching, and even biting SF. Eventually he accompanied SF into the next room so she could take care of the baby. Nysta held the baby, told SF to kneel, and urinated on her. Nysta then ordered SF to take a shower. When this was done, Nysta took SF and the baby back into the other room. While the child sat quietly by the wall, Nysta again asked SF who she had been with and again punched her in the face. He attempted intercourse, then made SF sit on the floor and perform oral sex. "And he had gotten out a lighter and was going to burn me with it. . . . And he kept talking to me about how I was a bitch, and to keep doing what he asked. And he continually would

hit me in the head . . . and I had to continue with the oral sex."[1]

¶7 The entire ordeal lasted more than two hours. At one point, Nysta threatened to kill SF and her two children and to "bury all three of us where nobody would find us."

¶8 SF left with her baby when Nysta passed out. Police arrived in response to a 911 call and arrested Nysta.

¶9 Despite a no-contact order, Nysta made hundreds of calls to SF from jail. These calls were recorded. Nysta professed his love for SF and claimed not to remember what happened. He asked her to drop the charges.

¶10 The State charged Nysta with first degree rape for the rape that occurred before the child was brought into the room, because it was during this episode that SF sustained the worst of her physical injuries; second degree rape for forcing SF into acts of oral sex after the child was brought into the room; and felony harassment for the threat to kill SF and her children. Other charges were two counts of misdemeanor violation of a court order and tampering with a witness. The State alleged that the second degree rape was an aggravated offense of domestic violence, deserving an enhanced sentence because it was committed in front of the minor child. *See* RCW 9.94A.535(3)(h)(ii). A jury convicted Nysta as charged and found by special verdict that the second degree rape was an aggravated domestic violence offense.

¶11 The standard range for the first degree rape was 240 to 318 months. For the second degree rape, it was 210 to 280 months. For these two crimes, the court imposed an exceptional sentence by running both sentences consecutively for a total of 450 months. This was based not only on the jury's special verdict but also on aspects of Nysta's criminal history that did not require a jury finding. This appeal followed.

---

[1] Report of Proceedings (June 9, 2010) at 44-51.

## INVOCATION OF THE RIGHT TO COUNSEL

¶12 The trial court held a hearing under CrR 3.5 to determine the admissibility of statements made by Nysta during an interrogation at the City of Kent Corrections Facility on August 3, 2009. The principal witness was Detective Robert Jones. Detective Jones, an officer with the Auburn Police Department, was investigating Nysta as a suspect in a first degree burglary that occurred in Auburn earlier on the same night as Nysta's attack on SF. Also present was Detective Derrick Focht, an officer with the Kent Police Department who was investigating Nysta's crimes against SF.

¶13 The transcript of the interrogation shows that Nysta, having been advised of his Miranda[2] rights, agreed to waive them and speak with the detectives about the burglary. Responding to questions from Detective Jones, Nysta denied being in Auburn on the night of July 31. He said he was drinking and gambling all night at a casino until he went home to SF's place in Kent. He admitted that when he got there, he slapped SF and then "went blank" until he woke up in handcuffs. Nysta continued to deny being in Auburn even when Detective Jones told him that witnesses had positively identified him at the scene of the burglary.

¶14 Detective Jones asked Nysta if he would be willing to take a polygraph examination in connection with the burglary investigation. Nysta at first was willing, saying, "Man we can do it I don't give a damn." But he began to express reluctance when told the polygraph was a tool to find out if he was telling the truth.

DETECTIVE JONES: Hm?

THE DEFENDANT: I don't give a damn I just know that I was in the casino.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

DETECTIVE JONES: Okay that's what you're sayin' but I don't know that.

THE DEFENDANT: I know.

DETECTIVE JONES: And that's one thi', that's a tool that I can use to see if you're bein' truthful that you were casino or you're at this house beatin' somebody's ass.

THE DEFENDANT: Come on man[.]

DETECTIVE JONES: So.

THE DEFENDANT: I might beat some, the only (sniffs) person I remember slappin' around was my girl that's it and I'm not gonna deny I didn't slap my girl.

. . . .

DETECTIVE JONES: Is the deal, this is where I am is I've got you as positively identified in this incident okay. . . .

. . . .

DETECTIVE JONES: Okay. Simple question, are you willin' to do a poly?

THE DEFENDANT: Do I have to do it though?

DETECTIVE JONES: Absolutely not. It is voluntary. It would be up to you if you wanted to do it or not.

THE DEFENDANT: Man I don't see why I gotta do it though. That thing is a machine man.

DETECTIVE JONES: It's an instrument absolutely. Is it accurate? Absolutely. If you have a polygraph examiner that knows what he's doin'.

. . . .

THE DEFENDANT: It's just a um ah computer mean it's.

DETECTIVE JONES: Well it kinda is but the deal is that it it deals with your (inaudible) nervous system okay it deals with ah um (pause) physiological changes in your body.

THE DEFENDANT: Um hmm.

DETECTIVE JONES: Alright that can tell me if you're bein' truthful or not alright it is very very accurate. And if you decide you wanna take that I will set that up and make sure it

happens but again it's voluntary. I don't wanna waste my time if you're saying' no I don't wanna do it.[3]

¶15 It was at this point during the interrogation that Nysta expressed a desire to talk to a lawyer.

> THE DEFENDANT: *Um hmm (pause) shit man I gotta talk to my lawyer someone.*
> DETECTIVE JONES: Okay.
> THE DEFENDANT: (inaudible) man if it's cool which you then I take it then.
> DETECTIVE JONES: Okay.
> THE DEFENDANT: If it's not, fuck it.
> DETECTIVE JONES: Okay fair enough. This is what I'll do I'll leave my number in your property.
> THE DEFENDANT: Um hmm.
> DETECTIVE JONES: And if you decide that you wanna take that all you gotta do is call me or have your attorney call me and I'll set it up alright?
> THE DEFENDANT: Man that's crazy why people wanna fuckin' put shit on me man. (pause) This is fuckin' bullshit man.

Pretrial Ex. 1, at 17 (emphasis added).

¶16 Detective Jones continued with more questions pertinent to the burglary and a few about what happened when Nysta went back to SF's house. On that topic, Nysta repeated his earlier admission that he slapped SF and then "went blank."[4]

¶17 The trial court concluded that Nysta did not unequivocally invoke his right to an attorney at any point during the questioning. The court found that at the beginning of the interrogation, after Detective Jones asked several clarifying questions, Nysta waived his rights and agreed to be interviewed. The court found that when Nysta

---

[3] Pretrial Ex. 1, at 16-17.

[4] Pretrial Ex. 1, at 23.

later requested to speak with an attorney, it was only for the purpose of deciding whether to take a polygraph examination:

6.  About half-way through the interview Det. Jones asked the defendant if he would be willing to submit to a polygraph examination. The defendant was hesitant about whether or not he wanted to take a polygraph exam and, after talking it over with Det. Jones for a few minutes, indicated that he wished to speak with an attorney before agreeing to take a polygraph exam. The court finds that when the defendant requested to speak with an attorney he was indicating his desire to speak with an attorney before taking a polygraph examination and that his request was not intended to indicate a desire to speak with an attorney prior to continuing the interview.

7.  At the conclusion of the interview the defendant again indicated that his statement had been completely voluntary.

Clerk's Papers at 89-90 (Findings of Fact 6-7).

2.  The court finds that the defendant did not unequivocally invoke his right to an attorney or to remain silent at any point before or during the questioning by Detectives Jones and Focht.

Clerk's Papers at 90 (Conclusion of Law 2).

¶18 Findings of fact entered following a CrR 3.5 hearing are measured by the substantial evidence standard. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). Nysta challenges the court's determination that he "did not unequivocally invoke his right to an attorney or to remain silent at any point before or during the questioning." Nysta contends the only tenable finding on this record was that his request for an attorney was unequivocal. We agree and hold that questioning should have ceased when Nysta said, "I gotta talk to my lawyer."

¶19 Under the Fifth Amendment to the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself." To secure the privilege

against self-incrimination, a person in custody must be advised before questioning begins that he has the right to the presence of an attorney. The defendant may waive this right, but there can be no questioning if he "indicates *in any manner or at any stage of the process* that he wishes to consult with an attorney before speaking." *Miranda*, 384 U.S. at 444-45 (emphasis added). A waiver of *Miranda* rights "may be contradicted by an invocation at any time." *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 2263, 176 L. Ed. 2d 1098 (2010). If the individual being questioned unequivocally states that he wants an attorney, interrogation must cease until an attorney is present. *Thompkins*, 130 S. Ct. at 2263-64; *Davis v. United States*, 512 U.S. 452, 461, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

¶20 The rule that questioning must cease if the suspect asks for a lawyer "provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." *Davis*, 512 U.S. at 461. The Supreme Court has "repeatedly emphasized the virtues of a bright-line rule in cases following . . . *Miranda*." *Arizona v. Roberson*, 486 U.S. 675, 681, 108 S. Ct. 2093, 100 L. Ed. 2d 704 (1988).

¶21 To successfully invoke the right to counsel, a suspect must do so "unambiguously." *Davis*, 512 U.S. at 459. That is, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. In *Davis*, the Court held the police had no obligation to stop questioning a suspect who, about an hour and a half into the interrogation, said, " 'Maybe I should talk to a lawyer.' " *Davis*, 512 U.S. at 462; *cf. State v. Radcliffe*, 164 Wn.2d 900, 907-08, 194 P.3d 250 (2008) (defendant's statement that " '[m]aybe [I] should contact an attorney' " was equivocal (alterations in original)).

¶22 The State contends that Nysta's request for an attorney was "equivocal" because, considering that the topic

under discussion at that moment was whether he wanted to take a polygraph, what his words really meant was that he was willing to continue the interview without the assistance of counsel but he wanted to consult with counsel before making a final decision about whether or not to take a polygraph. The State does not cite authority that supports giving such an elaborate contextual interpretation to words as plain as "I gotta talk to my lawyer." "Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Connecticut v. Barrett*, 479 U.S. 523, 529, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987).

¶23 Nysta did not say "maybe" or "perhaps." He did not use conditional or obfuscating words such as "if" and "or." *Cf. State v. Lewis*, 32 Wn. App. 13, 20, 645 P.2d 722 ("[I]f this is going to get into something deep . . . then I should have an attorney present. If there is any questioning on that particular subject."), *review denied*, 98 Wn.2d 1004 (1982). "I gotta talk to my lawyer" is plain language. "Using 'context' to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law." *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir.), *cert. denied*, 555 U.S. 818 (2008).

¶24 Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. *Smith v. Illinois*, 469 U.S. 91, 98, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). The interrogator may not proceed on his own terms as if the defendant had requested nothing. *Smith*, 469 U.S. at 99. If the interrogator does continue, the suspect's postrequest responses "may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 100. So the fact that Nysta went on responding to questions and agreed at the end of the interview that his statements had all been voluntary does not support a finding that "I gotta talk to my lawyer" was an equivocal statement.

¶25 We conclude the trial court erred in determining that Nysta did not effectively invoke his right to counsel.

¶26 The error requires reversal only if prejudicial. Harmless error analysis applies to erroneous admissions of statements obtained in violation of *Miranda*. *State v. Reuben*, 62 Wn. App. 620, 626, 814 P.2d 1177, *review denied*, 118 Wn.2d 1006 (1991). Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. *Guloy*, 104 Wn.2d at 425. Under the "overwhelming untainted evidence" test, we look only at the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Guloy*, 104 Wn.2d at 426. Under this test, a conviction will be reversed where there is any reasonable chance that the use of inadmissible evidence was necessary to reach a guilty verdict. *Guloy*, 104 Wn.2d at 426.

¶27 The interrogation was almost entirely concerned with the burglary. To the extent that there was any discussion of the charges involving SF, Nysta readily admitted to slapping her, and he made this admission before he mentioned wanting a lawyer as well as after. At no point did he confess to raping, threatening, or even having sexual contact with SF. The tainted evidence was repetitive of the untainted evidence. The untainted evidence was overwhelming. There is no reasonable chance that the inadmissible statements were necessary to reach a guilty verdict. The error was harmless.

## DOUBLE JEOPARDY

¶28 Nysta argues that his convictions for second degree rape and felony harassment violate double jeopardy because the threat to kill was used to prove the count of felony harassment and was also available to prove the forcible compulsion element of second degree rape.

44

¶29 Without presenting any legal authority or reasoning, the State has conceded that the two convictions were for the same offense. As grounds for the concession, the State cites an unpublished opinion of this court and declares, "The State can find no fault with this opinion."[5] This is unsatisfactory. "A party may not cite as an authority an unpublished opinion of the Court of Appeals." GR 14.1(a). No matter how well reasoned, unpublished opinions of this court lack precedential value, in part because they merely restate well established principles. RCW 2.06.040; *State v. Fitzpatrick*, 5 Wn. App. 661, 668, 491 P.2d 262 (1971), *review denied*, 80 Wn.2d 1003 (1972). If a party finds a helpful analysis in an unpublished opinion, the proper way to present it is to cite the authorities relied on in the unpublished opinion and show how they apply.

¶30 We are not required to accept an erroneous concession of law. *In re Pers. Restraint of Pullman*, 167 Wn.2d 205, 212 n.4, 218 P.3d 913 (2009). We do not accept the State's concession in this case.

¶31 The double jeopardy clauses of the Fifth Amendment to the United States Constitution and Washington Constitution article I, section 9 protect a defendant against multiple punishments for the same offense. *State v. Calle*, 125 Wn.2d 769, 772, 888 P.2d 155 (1995). The Washington double jeopardy provision is interpreted to be coextensive with the Fifth Amendment as interpreted by the United States Supreme Court. *State v. Gocken*, 127 Wn.2d 95, 107, 896 P.2d 1267 (1995). This court's review of a claimed double jeopardy violation is de novo. *State v. Freeman*, 153 Wn.2d 765, 770, 108 P.3d 753 (2005).

¶32 Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense. *Freeman*, 153 Wn.2d at 771. The mere fact that the same

[5] Br. of Resp't at 31.

*conduct* is used to prove each crime is not dispositive. *See United States v. Dixon*, 509 U.S. 688, 704, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (explicitly rejecting "same conduct" test); *Freeman*, 153 Wn.2d at 777.

¶33 The purpose of our review is to determine what punishments the legislative branch has authorized. *Calle*, 125 Wn.2d at 776. We begin with the language of the statutes themselves. Because the language of the statutes defining felony harassment and second degree rape do not specifically authorize cumulative punishment when a defendant commits both offenses against the same victim, we turn to a rule of statutory construction sometimes referred to as the *"Blockburger* test," after *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

¶34 Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304; *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004). The *Blockburger* test is referred to both as the "same elements test" and the "same evidence test." *Orange*, 152 Wn.2d at 818. " 'If each [element] requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.' " *Brown v. Ohio*, 432 U.S. 161, 166, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977), quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975). In *Blockburger*, a single sale of morphine was properly punished as two different offenses because each offense *required* proof of a fact which the other did not. *Blockburger*, 284 U.S. at 304.

¶35 Washington's cases say that a plea of double jeopardy can be sustained only if the offenses are the same " 'both in fact and in law.' " *Orange*, 152 Wn.2d at 816, quoting *State v. Reiff*, 14 Wash. 664, 667, 45 P. 318 (1896). As elaborated in *Reiff*, this means there is no double

jeopardy bar where "there are elements requisite to each which are not necessary to the other, and proof of the offense charged in either of the informations would not be sufficient to sustain a conviction under the other." *Reiff*, 14 Wash. at 667. The *Reiff* test is "indistinguishable" from the *Blockburger* test. *Orange*, 152 Wn.2d at 816. Later Washington cases continue to state the test as having one prong for elements and one for proof: "If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses." *State v. Vladovic*, 99 Wn.2d 413, 423, 662 P.2d 853 (1983), citing *State v. Roybal*, 82 Wn.2d 577, 581, 512 P.2d 718 (1973). But the two-pronged formulation does not differ materially from the *Blockburger* formulation: "whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. *Vladovic* and *Blockburger* should produce the same results. *See Calle*, 125 Wn.2d at 777 ("Same evidence" test as stated in *Vladovic* is very similar to the rule set forth in *Blockburger*, 284 U.S. at 304.).

¶36 The offense of felony harassment required proof that Nysta knowingly threatened to kill SF or her children and that the words or conduct placed SF in reasonable fear that the threat would be carried out. RCW 9A.46.020(1)(a)(i), (b), (2)(b)(ii); Instruction 18. The offense of second degree rape required proof that Nysta engaged in sexual intercourse with SF by forcible compulsion. RCW 9A.44.050(1)(a); Instruction 15. Proof of felony harassment did not require proof of sexual intercourse. Proof of second degree rape did not require proof of a threat to kill. Thus, at the abstract level of comparing the statutory elements, "there is an element in each offense which is not included in the other." *Vladovic*, 99 Wn.2d at 423. The two crimes are not the same "in law."

¶37 To determine that there is an element of each offense that is not included in the other is not a complete

analysis. This was the point of *Orange*: it is not enough merely to "compare the statutory elements at their most abstract level." *Orange*, 152 Wn.2d at 818. We are to consider the elements of the crimes both as charged and as proved. *Freeman*, 153 Wn.2d at 777. The question is "whether each provision *requires proof of a fact which the other does not*." *Blockburger*, 284 U.S. at 304, *quoted in Orange*, 152 Wn.2d at 818.

¶38 In *Orange*, our Supreme Court critiqued the double jeopardy analysis this court employed in *State v. Valentine*, 108 Wn. App. 24, 29 P.3d 42 (2001), *review denied*, 145 Wn.2d 1022 (2002), and showed that the *Blockburger* test does not stop with a comparison of the statutory elements; the facts used to prove the statutory elements must also be examined. In *Valentine*, this court's application of *Blockburger* was limited to a comparison in the abstract of the elements of assault and attempted murder, and it caused us to determine initially that the offenses were not the same. But ultimately we concluded they *were* the same. To do this, we pushed *Blockburger* aside and relied on other cases, one of which was *State v. Potter*, 31 Wn. App. 883, 645 P.2d 60 (1982). *Valentine*, 108 Wn. App. at 28. The *Potter* court had expressed a lack of confidence in the *Blockburger* test as a means to discern legislative intent. *Potter*, 31 Wn. App. at 888. The *Orange* court did not think our result in *Valentine* was wrong but took pains to point out that the same result could and should have been reached in both *Valentine* and *Potter* under the *Blockburger* test without searching elsewhere for indicators of legislative intent.

¶39 So in *Valentine*, for example, we should have asked whether the *evidence required* to support the conviction for either attempted murder or assault would have been sufficient to warrant a conviction upon the other. *Orange*, 152 Wn.2d at 820. Given the way both *Valentine* and *Orange* were charged and proved, the answer in each case was yes. "The two crimes were based on the same shot directed at the same victim, and the evidence required to support the

conviction for first degree attempted murder was sufficient to convict Orange of first degree assault." *Orange*, 152 Wn.2d at 820. In short, a direct application of *Blockburger* as a "same evidence" test, as well as a "same elements" test, was sufficient to reveal that the defendant had been convicted twice for the same offense. To use *Reiff* terminology, the charged crimes were the same "in fact" even if not the same "in law."

¶40 As discussed above, second degree rape and felony harassment are not the same in law. Each has an element not included in the other. Are they nevertheless the same in fact in the present case? No. When one looks both at the statutory elements and also at the facts used to prove them, it remains true that each offense required proof of a fact the other did not. This is not a case where evidence of the same single act was *required* to support each conviction. It is true, as Nysta argues, that the threat to kill was the evidence *required* to support the felony harassment conviction. But the threat to kill was not evidence *required* to prove second degree rape.[6]

¶41 One of the elements of second degree rape is forcible compulsion. As the jury was instructed, forcible compulsion means *either* physical force which overcomes resistance *or* a threat, express or implied, that places a person in fear of death or physical injury to oneself or another person, or in fear of being kidnapped or that another person will be kidnapped. RCW 9A.44.010. There was ample evidence that Nysta compelled the second degree rape by using physical force which overcomes resistance: he hit SF repeatedly in the head. In deciding that the State had proved forcible

---

[6] This case does not involve the merger doctrine, another method of discerning legislative intent where double jeopardy is alleged. The merger doctrine may help determine legislative intent "where the degree of one offense is elevated by conduct constituting a separate offense." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008), citing *Vladovic*, 99 Wn.2d at 419; *see also Reiff*, 14 Wash. at 668. Although forcible compulsion and felony harassment can both be established by a threat of death, it is not necessary to prove felony harassment to prove a particular degree of rape. *State v. Eaton*, 82 Wn. App. 723, 730-32, 919 P.2d 116 (1996).

compulsion, the jury did not have to rely on the death threat. As charged and proved, then, second degree rape did not *require* proof of a threat to kill. The threat to kill was not analogous to the single gunshot that established the double jeopardy violation in *Orange* where it was required to prove both crimes because it was the sole evidence available to prove both crimes.

¶42 Here, the State argued to the jury that either the death threat or the physical force proved forcible compulsion. Both types of proof were available to the jury, although the testimony does not make clear at what point in time the death threat was uttered. Nysta appears to assume that a double jeopardy violation occurs whenever the evidence *available* to prove one conviction is sufficient to support the other conviction. That assumption is incorrect. *Blockburger* and *Orange* use the terms "necessary" and "required" when stating the test. The double jeopardy violation in *Orange* occurred because "the evidence *required* to support the conviction for first degree attempted murder was sufficient to convict Orange of first degree assault." *Orange*, 152 Wn.2d at 820 (emphasis added). In this case, it cannot be said that the evidence *required* to support the conviction for second degree rape was sufficient to convict Nysta of felony harassment. The death threat was *available* to support second degree rape, but it was not *required*.

¶43 Nysta similarly appears to assume that to avoid a double jeopardy violation in a case where there is an overlap in the proof offered to establish each crime, the jury must be asked to specify by special verdict what evidence they relied on to support each conviction. He suggests that in his case, a double jeopardy violation occurred because the jury did not specify that to find forcible compulsion, they relied only on the evidence of physical violence. He cites no authority for this proposition. If there *had* been a special verdict or instruction from which one could deduce that the jury *necessarily* relied on the death threat to find the forcible compulsion element of second degree rape, then one

might argue that the evidence *required* to support the conviction for second degree rape was also sufficient to convict Nysta of felony harassment. For example, if the State had made an allegation of sexual motivation in connection with the charge of felony harassment for the purpose of justifying an exceptional sentence, the jury might have found by special verdict that the harassment was committed with sexual motivation. In which case, evidence of the death threat would have been not only *available* to the jury, but arguably *necessarily* relied upon by them to find the rape was committed with forcible compulsion. The only aggravating circumstance found by the jury was that the second degree rape was committed in the child's presence. The State had no obligation to obtain special verdicts specifying what evidence the jury used in finding Nysta guilty of second degree rape in order to demonstrate that it was an offense distinct from felony harassment.

¶44 An illustration of the distinction between evidence that is necessary and evidence that is merely available is found in *Illinois v. Vitale*, 447 U.S. 410, 419-21, 100 S. Ct. 2260, 65 L. Ed. 2d 228 (1980). In that case, the defendant struck and killed two children while driving. He was convicted of failure to reduce speed, a traffic offense. Later, the State brought a charge of manslaughter by automobile. The defendant argued that the second prosecution was barred because one of the available ways to prove manslaughter by automobile was to prove that the defendant recklessly failed to slow his vehicle. The Court concluded that the two offenses could not be the "same" under *Blockburger* if manslaughter by automobile did not *necessarily* entail proof of a failure to slow. *Vitale*, 447 U.S. at 419. The defendant would have a "substantial" claim of double jeopardy only if the State found it "necessary" to rely on the conduct of failure to slow in order to sustain its manslaughter case. *Vitale*, 447 U.S. at 420-21. Compare *Brown*, 432 U.S. at 167, and the discussion thereof in *Vitale*, 447 U.S. at 417 (if

proof of auto theft in *Brown* had not *necessarily* involved proof of joyriding, the successive prosecutions would not have been for the same offense). *See also Austin v. Cain,* 660 F.3d 880, 886-93 (5th Cir. 2011), *cert. denied,* 132 S. Ct. 1914 (2012). In *Austin,* evidence existed to support three alternative definitions of "first degree murder," one of which could be established by proof that the offender had the specific intent to kill while engaged in the distribution of cocaine. The State did not specify which of the three alternatives it was proceeding on, and the jury was not polled to determine which of them furnished the basis for attempted first degree murder convictions. Relying on *Vitale* and *Brown,* the court concluded that "where an offense constitutes only one of several alternative elements of another offense, the two are not the 'same offense' for double jeopardy purposes." *Austin,* 660 F.3d at 892.

¶45 In summary, felony harassment—a death threat—is one of two alternative ways to prove the forcible compulsion element of second degree rape. But second degree rape does not necessarily require proof of a death threat. And second degree rape did not necessarily require proof of a death threat, as this case was charged and proved, because there was evidence of physical force, the alternative way of proving forcible compulsion. Therefore, under *Blockburger* and *Orange,* the two offenses were not the same.[7] The legislature has defined felony threat as an independently culpable form of terror. When a felony threat occurs in the course of a second degree rape, it may be punished separately so long as it is not the evidence required to prove the forcible compulsion element of rape.

---

[7] Two offenses, even if adjudged to be the same under *Blockburger,* might nevertheless be subject to cumulative punishment if the statutes defining them were shown to serve different legislative purposes or be directed at separate evils. *Calle,* 125 Wn.2d at 780-81. Because neither party's brief considers this possibility, we do not explore it here.

## INEFFECTIVE ASSISTANCE OF COUNSEL

██ ██ ¶46 Nysta claims his trial counsel was ineffective for not arguing his convictions for second degree rape and felony harassment were the "same criminal conduct" for sentencing purposes. RCW 9.94A.589(1).

¶47 To prove ineffective assistance of counsel, a defendant must show (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances, and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

¶48 To constitute the "same criminal conduct" for purposes of determining an offender score at sentencing, both crimes must involve (1) the same criminal intent, (2) the same time and place, and (3) the same victim. RCW 9.94A-.589(1)(a). In construing the "same criminal intent" requirement, the standard is the extent to which the criminal intent, objectively viewed, changed from one crime to the next. *State v. Vike*, 125 Wn.2d 407, 411, 885 P.2d 824 (1994). Whether one crime furthered the other is relevant. *Vike*, 125 Wn.2d at 411.

¶49 It is unlikely that the sentencing court would have found that Nysta's crimes shared the same criminal intent. The objective of second degree rape is sexual intercourse. Nysta achieved the objective of sexual intercourse by means of his unrelenting use of physical force over a period of two hours. The threat of death had the independent objective of creating continuing fear to penalize SF for going out with another man. SF's testimony about the death threat does not specify exactly when it occurred and does not tie it to

any particular act of rape. There is no reason to believe Nysta intended the threat to compel SF's submission to sexual intercourse. The claim of ineffective assistance of counsel is denied.

## RIGHT TO A PUBLIC TRIAL

¶50 To assist in selection of the jurors, the court used juror questionnaires. The questionnaires contained 13 "yes" or "no" questions about sexual misconduct and domestic violence.

¶51 Some two weeks after Nysta was convicted, the trial court filed and sealed the questionnaires without conducting a closure analysis as described in *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995). Nysta contends his convictions must be reversed because this omission prejudiced his constitutional right to a public trial as delineated by *Bone-Club*.

¶52 This court addressed the public trial ramifications of sealing juror questionnaires in *State v. Coleman*, 151 Wn. App. 614, 214 P.3d 158 (2009), *State v. Lee*, 159 Wn. App. 795, 247 P.3d 470 (2011), and *State v. Beskurt*, 159 Wn. App. 819, 246 P.3d 580, *review granted*, 172 Wn.2d 1013 (2011). In these cases, the trial court sealed juror questionnaires without holding a *Bone-Club* hearing. On appeal, we held reversal was not required because the sealing order did not affect the defendant's right to a public trial. We limited the remedy to a remand for reconsideration of the sealing order. Nysta contends these cases were wrongly decided. We do not find his arguments compelling. The key factor is that the public was able to observe jury selection in open court. Following *Coleman*, we hold that Nysta's right to a public trial was not violated and that the public's right to open court records can be adequately secured by remanding for reconsideration of the sealing order in light of *Bone-Club*.

## SPECIAL VERDICT

¶53 The special verdict permitted the trial court to impose an exceptional sentence for an aggravated domestic violence offense. When the court did impose an exceptional sentence, it was supported not only by the jury's finding but also by two other grounds for which a jury finding is not necessary: (1) Nysta had committed multiple concurrent offenses and (2) his high offender score resulted in some of the current offenses going unpunished. *State v. Alvarado*, 164 Wn.2d 556, 568-69, 192 P.3d 345 (2008).

¶54 Nysta contends his exceptional sentence cannot stand because the jurors were erroneously instructed that they must be unanimous to return a "no" answer on the special jury verdict form, in violation of *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010).

¶55 Assuming the instruction was erroneous under *Bashaw*, the exceptional sentence was otherwise supported by Nysta's criminal history. If a reviewing court overturns one or more aggravating factors but is satisfied that the trial court would have imposed the same sentence based upon a factor or factors that are upheld, the court may uphold the exceptional sentence rather than remand for resentencing. *State v. Hughes*, 154 Wn.2d 118, 134, 110 P.3d 192 (2005), *overruled on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Here, the trial court stated the same exceptional sentence would be imposed based upon any one of the aggravating factors standing alone. Nysta is not entitled to relief under *Bashaw*.

## JUDGMENT AND SENTENCE

¶56 The judgment and sentence mistakenly lists Nysta's conviction for second degree rape as rape of a child in the second degree. On remand, the trial court should correct this scrivener's error.

## CONCLUSION

¶57  We remand for reconsideration of the sealing order and for correction of the scrivener's error in the judgment and sentence. Otherwise, we affirm.

SPEARMAN, A.C.J., and APPELWICK, J., concur.

Review denied at 177 Wn.2d 1008 (2013).