2016 MAR -7 PM 9:36



# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>BRIAN A. PEREZ REYES,<br><br>Appellant. | No. 72745-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: March 7, 2016 |

LEACH, J. — Brian Perez Reyes appeals his conviction for manslaughter in the first degree. He challenges the trial court's admission of statements he made during an interrogation without first receiving Miranda[1] warnings. The State claims that any erroneous admission of Perez Reyes's statements was harmless error. Because Perez Reyes did not make new or incriminating statements during the asserted custodial interrogation and overwhelming, untainted evidence supported the verdict, any error in admitting the interview was harmless beyond a reasonable doubt. We affirm.

## Background

Perez Reyes was the sole caretaker of his two-month-old son, D.P.R., on the evening of June 27, 2013. Early the next morning, Perez Reyes told his mother that D.P.R. was nonresponsive, and he and his mother drove D.P.R. to

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

the emergency room. Upon arrival at the hospital, D.P.R. was not breathing and had no pulse.

At the hospital, Perez Reyes described the events leading up to and causing D.P.R.'s injuries several times. He told the doctor at the emergency room that around 4:30 a.m. D.P.R. had still not woken up to eat, so Perez Reyes went to get his food but was unable to wake him when he returned. He told Aunna Collins, D.P.R.'s mother, that D.P.R. woke up around 3:00 a.m., so he went to get a bottle. He said he found D.P.R. was not breathing when he returned. He told Bianca Collins, the maternal grandmother, that he tried to wake D.P.R., but D.P.R. would not move.

While D.P.R. was transferred to Seattle Children's Hospital, the E.R. doctor at Swedish contacted Child Protective Services. She reported that Perez Reyes did not seem appropriately concerned. At Seattle Children's Hospital, the intensive care doctor treating D.P.R. concluded that nonaccidental trauma remained the leading diagnosis. Accordingly, she notified Child Protective Services and the police department.

A hospital social worker then interviewed Perez Reyes. Perez Reyes told her that D.P.R. had woken up crying. When Perez Reyes got back from getting a bottle, he saw D.P.R. rapidly inhaling and having difficulty breathing. Perez Reyes then demonstrated shaking D.P.R. gently to wake him and trying CPR (cardiopulmonary resuscitation).

D.P.R. died the afternoon of June 29, 2013. Physical examinations of D.P.R. at the hospital and during the autopsy revealed that he had suffered a devastating brain injury consistent with nonaccidentally inflicted trauma. After examining D.P.R., the chief medical examiner and a child abuse specialist each found that a short fall would not have caused the injury.

The chief medical examiner classified the manner of death as homicide caused by violent shaking. He also determined that some time probably elapsed between "the infliction of the injury and the time the brain [had] really swollen up causing a medical problem."

On June 28, 2013, Snohomish County Sheriff's detectives were called to the hospital to investigate. At the hospital, Bianca Collins told a detective that she and Aunna Collins had previously warned Perez Reyes about handling D.P.R. too roughly.

At Perez Reyes's apartment complex, Perez Reyes and Aunna Collins agreed to speak with detectives. Aunna Collins told a detective that she had previously noticed a bruise on D.P.R.'s left leg in an apparent fingerprint pattern. Although Aunna did not know the cause of the injury, Perez Reyes told her to hide it from her mother, Bianca Collins, because he thought she would become suspicious.

Detectives Scharf and Ross interviewed Perez Reyes in Detective Ross's car. Detective Ross explained the process of a recorded interview and told Perez Reyes that he was not under arrest and could leave at any time. Perez

Reyes gave permission to have the conversation recorded and signed a noncustodial interview form. Ross and Scharf questioned Perez Reyes for just over 3 hours. The first portion of the interview lasted about 1 hour and 15 minutes. After a 10- to 20-minute break, the detectives asked Perez Reyes if he would continue to speak with them. During the break, a detective told Ross that the hospital had classified D.P.R.'s injuries as not accidental but had been inflicted by shaking the baby violently. The second interview lasted about 2 more hours.

During both interviews, Perez Reyes told the detectives that he had picked up D.P.R. to go make a bottle but tripped and dropped D.P.R. on his head. Then when he picked D.P.R. up, he realized that D.P.R had stopped breathing, so he moved him back and forth two or three times.

Toward the end of the second interview, Detective Scharf said, "I think we're gonna just have to take him to jail." The conversation with Perez Reyes continued for a short time. During this time, Perez Reyes repeatedly said that he had told the detectives everything that had happened and he wanted to go be with his son. Before long, Ross got out of the car, leaving Scharf with Perez Reyes. After five minutes, Ross returned, opened the door, placed Perez Reyes under arrest, and read him his Miranda rights.

Perez Reyes then agreed to speak to Detective Martin and demonstrated how he had dropped D.P.R. but had not violently shaken him. Martin asked if Perez Reyes was willing to continue talking, and Perez Reyes agreed. In

Martin's car, Perez Reyes signed a recorded interview form and a form acknowledging he understood his Miranda rights and was waiving them. Detective Martin had Perez Reyes again describe what happened the night before for about 49 minutes until Perez Reyes stated he did not wish to speak anymore.

The trial court conducted a CR 3.5 hearing on his statements' admissibility. Perez Reyes claimed that after the detective said, "I think we're gonna just have to take him to jail," the interview became custodial and required Miranda warnings. Because the detectives gave none, any subsequent statement was not admissible as evidence. The trial court disagreed and admitted the entirety of the two interviews into evidence. The parties agreed to a stipulated bench trial, and the court found Perez Reyes guilty of first degree manslaughter. Perez Reyes appeals.

Analysis

Perez Reyes asserts that his conviction must be reversed because the trial court erred in admitting the last part of his interview with Detective Scharf and Detective Ross. He contends that after hearing Detective Scharf say, "I think we're gonna just have to take him to jail," he reasonably believed that he was in custody. This required the detectives to give him Miranda warnings before continuing the interview.

The Fifth Amendment to the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself."[2] To protect this right, a suspect must be warned before any custodial interrogation "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney" or the statement cannot be used as evidence at trial.[3] Miranda warnings are only required after the person is taken into "custody," meaning "a reasonable person in the individual's position would believe he or she was in police custody to a degree associated with formal arrest."[4]

If a court admits a statement obtained in violation of Miranda, this error requires reversal only if prejudicial.[5] We review the record de novo to determine if the error is harmless beyond a reasonable doubt.[6] To find a Miranda violation harmless beyond a reasonable doubt, we look "only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt."[7] The State has the burden of demonstrating that the admission of the statement did not contribute to the final conviction.[8] This court

---

[2] Miranda, 384 U.S. at 444-45.
[3] Miranda, 384 U.S. at 444-45.
[4] State v. Lorenz, 152 Wn.2d 22, 36-37, 93 P.3d 133 (2004).
[5] State v. Nysta, 168 Wn. App. 30, 43, 275 P.3d 1162 (2012); State v. Reuben, 62 Wn. App. 620, 626, 814 P.2d 1177 (1991).
[6] Arizona v. Fulminante, 499 U.S. 279, 295, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).
[7] State v. Guloy, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985).
[8] Fulminante, 499 U.S. at 296.

will reverse a conviction if there is any reasonable chance that the use of inadmissible evidence was necessary to reach the guilty verdict.[9]

The parties agree that the earlier interviews between Perez Reyes and the two detectives were noncustodial and any statements made during that time were admissible. The parties also agree that Perez Reyes did not change his statement of the facts during the entire interview period, including the time when Perez Reyes asserts the interview became custodial. Perez Reyes only challenges the statements he made to police officers during the final minutes of the second interview. But even if the statements made during that portion of the interview were tainted, striking those statements would not alter the evidence available to the trial court because "[t]he tainted evidence was repetitive of the untainted evidence."[10] Thus, we need not decide if the interview was custodial during that short portion of the interview.

The only evidence the detectives gained from the interviews was Perez Reyes's description of what happened at the time of the injury. The record makes clear that Perez Reyes made voluntary statements consistently providing the same description of how D.P.R. had been injured before the time he claims the interview became custodial and in an interview with another detective after waiving his rights. During both interviews, Perez Reyes said that he had dropped D.P.R. on his head while going to get a bottle and that D.P.R. was not breathing

---

[9] Nysta, 168 Wn. App. at 43.
[10] Nysta, 168 Wn. App. at 43.

when he picked him up. This description of how the injury occurred is inconsistent with the actual injury and different from what Perez Reyes had previously told others. Perez Reyes does not specify any information provided during the end of the interview that the trial court should have stricken. The record provides no indication that the trial court used any information from that period in convicting Perez Reyes.

Instead, the trial court relied primarily on evidence obtained from other sources. Perez Reyes confirmed to others that he had D.P.R. in his sole care during the time the injury occurred. The testimony of the doctors who performed physical examinations of D.P.R. at the hospital and during the autopsy revealed D.P.R. had suffered a devastating brain injury caused by a nonaccidentally inflicted trauma, such as violent shaking. Perez Reyes told conflicting stories when describing the events causing D.P.R.'s fatal injuries to Aunna Collins, Bianca Collins, the doctors providing treatment, the social worker, and the police. All of these statements were inconsistent with the medical findings. Finally, Aunna and Bianca Collins told detectives that Perez Reyes had a history of handling D.P.R. too roughly. This untainted evidence overwhelmingly demonstrates Perez Reyes's guilt.

## Conclusion

Even if Perez Reyes made statements during a custodial interrogation without receiving Miranda warnings, there is no reasonable chance that the use of the asserted tainted evidence was necessary to reach the trial court's guilty

verdict. Because overwhelming, untainted evidence supports the trial court's decision, any error in admitting the challenged portion of the interview was harmless. We affirm.

_Leach, J._

WE CONCUR:

_Becker, J._