# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59410-2-II |
| Respondent, | |
| v. | |
| JENNIFER GHAKING, aka JENNIFER GEAKING, JENNIFER MARIE GAKING, JENNIFER MARIE GAKING-SAENZ, JENNIFER MARIE SAENZ, JENNIFER M. GAKING, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Jennifer Gaking appeals her convictions for two counts of unlawful possession of a controlled substance with intent to deliver. Gaking asserts that the trial court erred in ruling that evidence that Gaking smirked or smiled in response to a question by the police was admissible, and that this error allowed the police witness to comment on her silence in violation of her right to due process. She argues that the State also violated her right to due process by following the trial court's ruling and soliciting this evidence in its questioning of the officer as well as remarking on it during closing argument. The State responds that the trial court did not err in its ruling and that the State, likewise, did not err in either its questions or its argument because Gaking's smirk or smile was not silence, but instead was an affirmative response to the question. The State also argues that even if the trial court's ruling (and its subsequent actions that were allowed by that ruling) were error, the error was harmless beyond a reasonable doubt.

We affirm Gaking's conviction because, even assuming that the trial court erred in allowing the State to introduce this evidence, the error was harmless. Likewise, the State's actions in eliciting this evidence and discussing this evidence during closing argument, even if it followed an erroneous trial court ruling, were harmless. There was overwhelming untainted evidence of Gaking's guilt, and the references to Gaking's nonverbal smirk or smile were passing at best.

FACTS

I. Background Incident

Officers detained Gaking while executing a warrant to search her residence for drugs. The lead investigator, Sergeant Clark, advised Gaking of her *Miranda* rights.[1] Gaking acknowledged that she understood her rights, and answered a series of questions posed by Sergeant Clark. He asked Gaking if he would find any illegal material in her room, and she said that he would find a pipe and drug scrapings, but no other illegal materials. Gaking informed Sergeant Clark that she was unemployed. Sergeant Clark asked if she was selling large quantities of narcotics. She responded that "she doesn't sell like that." Clerk's Papers (CP) at 65. When Sergeant Clark asked if she was selling, Gaking smirked or smiled and looked away. Gaking did not make an unequivocal invocation of her *Miranda* rights, but Sergeant Clark stopped the interrogation and began interrogating Gaking's housemates.

Meanwhile, officers conducted a search of the residence, including Gaking's bedroom. They discovered a hidden shelf compartment on Gaking's bedroom wall containing 60 grams of heroin and 40 grams of methamphetamine. They also found multiple scales, money, a counterfeit bill detector, finger covers, cell phones, and packaging materials including small baggies in

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Gaking's bedroom. Gaking did not have any drug paraphernalia for personal use in her bedroom. Officers documented a large quantity of new clothing with tags still attached, shoes, costume jewelry, name-brand purses, and more than 25 containers of laundry detergent in the laundry room. Gaking also had a monitor in her bedroom with live surveillance feed from cameras posted on the exterior of the home.

Approximately 30 minutes after the initial interrogation, Sergeant Clark returned to interrogate Gaking about what officers found in her bedroom. Sergeant Clark asked Gaking about the quantities of what officers suspected to be heroin and methamphetamine; Gaking responded that the narcotics were hers. The State charged Gaking with two counts of unlawful possession of a controlled substance with intent to deliver, one for heroin and one for methamphetamine. The case proceeded to a jury trial.

## II. Pretrial

Before trial, Gaking moved the court to exclude Sergeant Clark's testimony regarding her nonverbal response to whether she sold narcotics. The court conducted a CrR 3.5 hearing and Sergeant Clark testified regarding his exchange with Gaking, including the interactions detailed above. The State argued Gaking's silence was admissible because she did not unequivocally invoke her right to silence. The State further argued that Gaking's silence and physical response was an adoptive admission. Gaking did not dispute that she had been properly read her *Miranda* rights, nor that she made a voluntary, knowing, and intelligent waiver of those rights. Gaking argued that admitting her silence and physical response as an adoptive admission violated her right to silence and rejected that the circumstances were such that a reasonable person would have responded if there was no intention to acquiesce.

3

The trial court rejected this argument. The trial court found that Gaking was in custody when she spoke with police; was correctly advised of her constitutional rights; and made a knowing and intelligent wavier of those rights. The trial court concluded that Gaking never unequivocally invoked her right to remain silent and consequently concluded her nonverbal response was admissible at trial as an adoptive admission. The trial court reasoned that (1) Gaking heard Sergeant Clark's question about whether she was dealing; (2) she was able to respond, as was evident from her responses to prior questions; and (3) she would have responded in the negative if there was no intention to acquiesce to the statement.

### III. Trial

During trial, the State again called Sergeant Clark as a witness. Sergeant Clark's trial testimony was consistent with his testimony from the pretrial hearing, but he made a specific reference to the fact that Gaking did not answer his question:

> Q: . . . Did you ask her if she was selling a large amount of narcotics?
> A. Yes.
> Q. What was her response?
> A. She said "I don't sell like that."
> Q: Did you ask her if she was selling?
> A. Yes.
> Q. What was her response to that?
> A. She kind of just smiled and didn't answer, smiled or smirked and didn't answer.
> Q: At that point, did you stop speaking to Ms. Gaking for a time?
> A. Yes.
> Q. What did you do at that point?
> A. I went and interviewed everyone else that was in the residence.

3 Verbatim Rep. of Proc. (VRP) at 209. Sergeant Clark did not make any additional references to Gaking's silence, but instead detailed what officers found in Gaking's room and his impressions of the evidence. He testified that in the context of finding heroin, methamphetamine, scales, and packaging, finding several cell phones in Gaking's room was not odd; in his experience, narcotics

4

dealers at all levels use multiple phones to separate their dealing with their personal line. The State asked Sergeant Clark whether Gaking's statement about being unemployed seemed inconsistent with what was in her bedroom. Sergeant Clark stated that, in his experience, street-level dealers will exchange narcotics for items that are commonly shoplifted or stolen from places, including detergent and clothing. Sergeant Clark affirmed that all the evidence was consistent with someone selling narcotics.

Other officers supported Sergeant Clark's conclusions. Officer Anderson attested "it is very common for there to be extensive surveillance systems" in homes where drugs are being sold. 4 VRP at 276. Officer Anderson also shared that finding wads of $20 bills was significant because "those purchasing small quantities use small bills." *Id.* at 277. Officer Martin attested that it is common for dealers to sell but not use heroin and methamphetamine at the same time.

Gaking testified in her defense. She urged there was a legitimate excuse for the circumstantial evidence found in her bedroom. Gaking asserted that she purchased foreclosed storage units and ran a legitimate resale business to sell the contents. Police found the business license in her room. She stored some of the items she purchased in her bedroom and others in an off-site storage unit. The clothing, shoes, accessories, scales, and packaging materials were contents from these purchases that she intended to resell. The defense also implied that the small denomination money found in her drawers was from lottery winnings at a casino, not evidence of street-level dealing. The defense attempted to minimized the significance of the live-feed surveillance feed in her bedroom and cited prior property damage as the motive for installing the cameras and monitor. The defense noted that police didn't find a ledger or crib notes in Gaking's room, nor did they test for any drug residue on the scales or inside one of the small baggies found

in Gaking's dresser with a sticky substance inside. Officers did not check to see if the scales functioned. Furthermore, it challenged whether the quantities of narcotics were consistent with that of a dealer, noting that "some people buy [drugs] in bulk." *Id.* at 327.

Additionally, the defense challenged Gaking's admission of guilt, asserting she was unaware a housemate's narcotics were stored in her shelf. Gaking stated all of her seven housemates had access her room, though she only knew three of them. According to Gaking, she believed a housemate stored the heroin and methamphetamine in her hidden shelf for safekeeping. She had given permission to this housemate to put something in the shelf shortly before police arrived to search the premises, but Gaking did not inquire about what they wanted to store. Gaking alleged that Sergeant Clark presented her with the bag of marijuana in the shelf, and only inquired about whether the marijuana was hers. She admitted that it was.

During closing arguments, the State reviewed evidence that it had presented during trial including testimony from officers. The State identified inconsistencies between Gaking's testimony and other evidence in the record. The State highlighted that the only issue facing the jury was whether there was intent to deliver. To determine if the State had met this requirement, the State encouraged jurors to think broadly:

> You don't think of each of these items in a vacuum, you step back and get all of them, the finger coverings, the number of baggies, the amount of drugs that were there, the different type of drugs that were there. These, when you take a step back, provided with her statement, her own statement when asked if she didn't sell like that, her response was -- or sorry. When asked if she sells large amounts of narcotics, her response to Sergeant Clark was "I don't sell like that."
>
> Combined with her next question by Sergeant Clark, "Well, do you sell?" And *she looked away and smiled or smirked*.
>
> Ladies and gentlemen, that statement and that conduct, that movement, shows that she intended to sell those items. So the State has proven beyond a

6

reasonable doubt, Count I, that the defendant possessed heroin with intent to deliver.

6 VRP at 509 (emphasis added).

The State reiterated its closing argument for the second charge of possession with intent to distribute methamphetamine. The State referenced Gaking's nonverbal response:

The fact that we have two different types of drugs, each at a dealer's amount and far beyond a user's amount, that we have multiple different sizes and types of bags, we have scales, we have finger coverings, it all goes to the fact that the defendant - - the defendant's *smirk to Sergeant Clark* was because she was possessing those drugs and she knew she was possessing them with intent to deliver, and I'm asking you to find her guilty of both counts. Thank you.

*Id.* at 512 (emphasis added). During its closing rebuttal statement, the State again made passing reference to Gaking's nonverbal response:

Fact, when asked if she sells large sums of drugs, her response was, "I don't sell like that" in fact, when asked if she sells, *she smiled and looked away*.

. . . .

[ ] You saw evidence of what was considered a user amount [of controlled substances]. We don't know what the substance is, but it was considered a user amount. Compare that to State's Exhibit 44 and State's Exhibit 45. These two products combined with all of the other evidence that you have here, the photos, the bags, the scales, the finger coverings show you what the defendant was intending to do. The defendant *told Sergeant Clark in not so many words what she was intending to do*; that these drugs were hers and evidence shows she was intending to deliver them.

*Id.* at 528, 530-31 (emphasis added).

The jury convicted Gaking for two counts of unlawful possession of a controlled substance with intent to deliver, one for heroin and one for methamphetamine. Gaking appeals.

DISCUSSION

## I. TRIAL COURT'S RULING[2]

Gaking asserts that the trial court erred by admitting Gaking's nonverbal gestures in response to Sergeant Clark's question as an adoptive admission under ER 801(d)(2)(ii). Although the State argued below that Gaking's action in smiling or smirking and turning her head in response to Sergeant Clark's question about whether she sells drugs was an adoptive admission, the State now argues that Gaking's gestures were admissible as a communicative expression that was inconsistent with silence. The State also argues that even if the trial court erred, any error was harmless beyond a reasonable doubt.

We conclude that, although Gaking's nonverbal response was more akin to a communicative expression than silence, even if error occurred it was harmless beyond a reasonable doubt.

A. *Standard of Review*

We review a trial court's decision as to admissibility of any statements under an abuse of discretion standard. *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). The trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or made for untenable reasons. *State v. Dixon*, 159 Wn.2d 65, 75-76, 147 P.3d 991 (2006). A decision is

---

[2] As an initial matter, the State contends that Gaking's failure to assign error to any factual finding or conclusion of law is a procedural default that precludes our review of her assignments of error. But as Gaking notes in her reply, she does not take issue with the trial court's findings of fact about what occurred, but rather challenges the trial court's legal conclusions stemming from those factual findings. Although Gaking does not expressly assign error to this conclusion of law, the nature of the appeal is clear and Gaking has sufficiently briefed the issue. The State, moreover, does not allege any prejudice from our consideration of Gaking's assignments of error, nor can we discern any. We exercise our discretion to consider the merits of the case.

manifestly unreasonable if the court applies the correct legal standard but reaches a decision that no reasonable person would. *Id.* at 76. A decision is based on untenable grounds if the trial court relies on an incorrect legal standard or facts unsupported by the record. *Id.* The burden is on the appellant to demonstrate abuse of discretion. *State v. Williams*, 137 Wn. App. 736, 743, 154 P.3d 322 (2007). A trial court's evidentiary rulings can be affirmed on any grounds supported by the record and the law. *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012). We review the question of whether a defendant invoked their right to remain silent as a mixed question of law and fact, and our review is de novo. *State v. I.B.*, 187 Wn. App. 315, 319-20, 348 P.3d 1250 (2015).

B. *Communicative Expression[3]*

The State no longer contends that Gaking's gestures were adoptive admissions. Instead, the State now argues that we should affirm the trial court's admission of Gaking's nonverbal gestures as an affirmative response through a communicative expression. Stated another way, the State contends there was no comment on Gaking's silence because she was not silent. Gaking responds that her actions of turning her head and smiling or smirking were not the sort of actions that qualify as nonverbal responses. Gaking argues that only gestures like head shaking or nodding, or pointing a finger at something constitute nonverbal assertions, but mere facial expressions and body language do not communicate a specific response.

The State relies on our unpublished decision in *State v. Larisch*, No. 46850-6-II, (Wash. Ct. App. Mar. 15, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2046850-6-II%20Unpublished%20Opinion.pdf. In *Larisch*, the trial court stated that Larisch " 'made a gesture

---

[3] Because the State no longer contends that Gaking's gestures were an adoptive admission, we need not address that argument as a basis to affirm the trial court.

in which he sagged his body and looked down at the ground, which [the deputy] understood as an indication that Larisch knew he had been caught.' " *Id.* at 8 (quoting CP at 104-05). We observed that an invocation of the right to remain silent must be unequivocal, and held that a reasonable officer under the circumstances would not necessarily have understood Larisch's conduct as an invocation of silence. *Id.* Rather, we held, Larisch's gesture was "an answer to a question, not [ ] an invocation of silence." *Id.*

Although the gestures in this case are less definitive than those in *Larisch*, they are more akin to a communicative response than an assertion of silence. Furthermore, any error in admitting this evidence was harmless beyond a reasonable doubt.[4]

C. *Harmless Error*

If the trial court's admission of this evidence was error, the error was harmless. Because the claim of error in this case involves the question of Gaking's exercise of her right to silence, we treat this as a claim of constitutional error and apply the constitutional harmless error test.[5] "Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that

---

[4] The State also argues in the alternative that Gaking's gesture was admissible as demeanor evidence, but the import of the State's argument in this section of its brief is not meaningfully different than its argument that Gaking's gesture was a communicative expression. To wit, the State argues that Gaking's demeanor "was an affirmative physical response and reaction." Br. of Resp't at 28.

[5] Gaking argues that only her claim of error against the State requires the constitutional harmless error test and that the trial court's ruling should be reviewed under the nonconstitutional harmless error test. Throughout her brief, Gaking singles out the actions of the State as somehow more odious than that of the trial court. This is peculiar. The State sought permission, prior to the trial, to introduce this evidence and the trial court held a hearing on the matter. The State did not, sua sponte and without permission, introduce this testimony. If there was error, it originated with the trial court's ruling on the motion in limine. The State's conduct was in line with the trial court's ruling. In any event, we review this case under the constitutional harmless error test.

the error was harmless." *State v. Nysta*, 168 Wn. App. 30, 43, 275 P.3d 1162 (2012). In determining whether a constitutional error warrants a new trial, we ask whether the error was harmless beyond a reasonable doubt. *State v. Guloy*, 104 Wn.2d 412, 425-426, 705 P.2d 1182 (1985). Error is harmless beyond a reasonable doubt when the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *Id.*

Here, the untainted evidence overwhelmingly supports the jury's guilty verdict for both counts of unlawful possession of controlled substances with the intent to deliver. Although more must be shown than mere possession to demonstrate an intent to deliver, evidence showing possession coupled with additional facts suggestive of a sale permit an inference of intent to deliver. *State v. Cobelli*, 56 Wn. App. 921, 925, 788 P.2d 1081 (1989); *State v. O'Connor*, 155 Wn. App. 282, 290-91, 229 P.3d 880 (2010). Even the possession of a large amount of drugs must be accompanied by additional indicia of intent to deliver. *State v. Zunker*, 112 Wn. App. 130, 135-36, 48 P.3d 344 (2002).

The evidence found in Gaking's bedroom demonstrates far more than mere possession of a controlled substance. As we detailed above, officers found a hidden shelf compartment on Gaking's bedroom wall containing 60 grams of heroin and 40 grams of methamphetamine. They also found multiple scales, money, a counterfeit bill detector, finger covers, cell phones, and packaging materials including small baggies in Gaking's bedroom. Gaking had a monitor in her bedroom with live surveillance feed from cameras posted on the exterior of the home. Gaking did not have any drug paraphernalia that would indicate her personal use of the large quantity of drugs found in her bedroom.

Officers also documented a large quantity of new clothing with tags still attached, shoes, costume jewelry, and name-brand purses, and more than 25 containers of laundry detergent in the laundry room. Sergeant Clark, Officer Anderson, and Officer Martin testified about the significance of this evidence and why it was indicative of narcotics distribution. Against this backdrop, the testimony and reference to Gaking's smile or smirk and head turn when asked if she sells drugs was of minor moment in the trial. Little could be gleaned from Gaking's gestures that Gaking had not already shared in responses to other questions. When asked if she sold large quantities of controlled substances, Gaking informed Sergeant Clark that she "doesn't sell *like that*" and admitted the narcotics, packaging, scales, and money were hers. CP at 65 (emphasis added).

The error from the trial court's admission of this evidence, if any, was harmless.

## II. THE STATE'S QUESTIONS AND ARGUMENT

Gaking separately argues that the State violated her constitutional rights against self-incrimination and to due process by eliciting testimony from Sergeant Clark about Gaking's gestures in response to the question about whether she sold drugs, and its remarks in closing argument about that testimony. But as we noted above, the State's elicitation and use of this evidence was in keeping with the trial court's ruling allowing this evidence. Thus, the error, if any, lies in the trial court's ruling on the motion in limine. We therefore decline to separately analyze this claim.

For the reasons we set forth above, any error resulting from the trial court's ruling admitting this evidence or the State's elicitation and use of this evidence is harmless beyond a reasonable doubt.

No. 59410-2-II

## CONCLUSION

Even assuming the trial court abused its discretion by admitting Gaking's nonverbal gestures and the State improperly commented on the gestures, the error was harmless. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

LEE, J.

CHE, J.