IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86608-7-I |
| Respondent/Cross-Appellant, | DIVISION ONE |
| v. | |
| DENNIS M. BAUER, | UNPUBLISHED OPINION |
| Appellant/Cross-Respondent. | |

SMITH, C.J. — Dennis Bauer and two acquaintances were arrested in connection with three murders. Bauer was charged with three counts of aggravated murder in the first degree, four counts of theft of a firearm, six counts of unlawful possession of a firearm in the first degree, and six counts of possession of a stolen firearm.

A jury convicted Bauer of three counts of aggravated murder in the first degree and multiple firearm charges. Bauer was sentenced to life in prison without the possibility of parole. Bauer appeals, arguing the trial court erred in admitting particular evidence, in limiting his ability to cross-examine certain witnesses, and in instructing the jury that they could find aggravated murder based on felony murder. Bauer also asserts that law enforcement violated his constitutional rights by continuing interrogation after he unequivocally invoked his right to counsel. The State cross-appeals, asserting that the court erred in denying the admission of evidence under forfeiture by wrongdoing and recorded recollection.

Because the trial court erred in admitting extensive inadmissible evidence, in admitting inculpatory hearsay statements, in including Bauer's custodial statements in violation of his *Miranda*[1] rights, and in prohibiting Bauer from cross-examining key witnesses about their credibility, and these errors combined denied Bauer a fair trial, we reverse and remand for a new trial.

FACTS

Background

Darrell Iverson (Darrell), his son Jordan Iverson (Jordan), and Jordan's girlfriend Tiffany May all lived on Darrell's property in Port Angeles. The Iversons were known in the area for selling drugs and people came and went from the property at all hours of the day and night.

Dennis Bauer lived in a nearby cabin, known as "the Ranch," and allowed people to use his property when they needed a place to stay. Those who stayed at the property, including Bauer, often used drugs. Kallie LeTellier and Ryan Ward both lived at the Ranch through 2018. Bauer, LeTellier, and Ward all frequently visited the Iverson property to use methamphetamine.

In December 2018, law enforcement found the Iversons and May deceased on their property. Both Darrell and May had been shot seven times; Jordan had been shot five times. About a month later, law enforcement arrested LeTellier, Ward, and Bauer when DNA evidence and text messages placed all three at the Iverson house on the night of the shooting. Ward was carrying a gun

---

[1] *Miranda v. Arizona*, 384 U.S. 426, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)

registered to Darrell when he was arrested. When law enforcement executed a search warrant at the Ranch, they found firearms and additional items belonging to the decedents.

Following her arrest, LeTellier immediately gave a statement conceding that she, Ward, and Bauer were at the Iverson property the night of the shootings. She initially stated that she saw Bauer shoot May, heard additional shots, and realized Ward shot Darrell and Jordan. She denied any involvement in the killings and maintained that same story the next day. She changed her account, however, when law enforcement told her they had video proof of her involvement though they in fact did not. LeTellier then stated that she shot and killed May. She maintained sole responsibility for shooting May in two subsequent interviews.

LeTellier also told law enforcement that two weeks prior to the shootings she was in the Iversons' kitchen when she heard footsteps behind her and was hit over the head. She blacked out and awoke naked and tied to a bed. The Iversons then raped her for over seven hours. May walked in and out of the room during the rape.

LeTellier recounted returning to the Ranch and telling Ward and Bauer what happened. She noted that both were angry and upset and that Ward threatened to kill the Iversons in retaliation. Bauer later testified that he had no knowledge of the rape prior to the killings.

Following Bauer's arrest, he was also questioned by law enforcement. After the officers read him his *Miranda* rights and offered a waiver of those rights

3

to sign, Bauer stated, "I've found that usually people that start talking end up in kind of trouble, they don't even know what they're getting into so I'd much rather speak to a lawyer I think." The officers reiterated that the wavier was necessary to continue the conversation. Bauer then signed the wavier and responded to questioning without an attorney.

Pleas

The State charged LeTellier, Ward, and Bauer with three counts of aggravated first-degree murder each. The State reduced LeTellier's charges, however, in exchange for her cooperation. LeTellier pleaded guilty to second-degree murder in February 2020 and received a 33-year sentence. When she entered her first plea, she took full responsibility for her participation and did not place blame on Bauer.

Ward pleaded guilty as charged to three counts of aggravated murder. In his guilty plea statement, Ward wrote that LeTellier's statement was "mostly accurate, in that the victims of this crime were murdered for her sexual enslavement at their hands." The court sentenced Ward to life without the possibility of parole.

Bauer entered a plea of not guilty and his case proceeded to trial in October 2021. As Bauer proceeded to trial, LeTellier reached out to the prosecutor, seeking to withdraw her guilty plea. LeTellier claimed, in contrast to all of her earlier statements, that Bauer held a gun to her head and forced her to shoot May. She conceded that this contradicted her earlier accounts and acknowledged that she had many opportunities to share this version of the story

4

before entering her initial plea taking full responsibility for killing May. She nonetheless maintained this new version.

The court denied the admission of LeTellier's letter to the prosecutor as evidence in Bauer's trial. The court also prohibited Bauer from cross-examining LeTellier on her effort to withdraw her plea.

<u>Trial</u>

At trial, the State argued around the motive Ward articulated of avenging LeTellier, introducing a separate motive arising from a drug debt the State claimed Bauer owed Darrell. In attempting to prove this alternative motive, the State introduced extensive evidence about Bauer's participation in the drug trade. Bauer repeatedly objected.

Both Bauer and LeTellier testified at trial. Ward refused to testify, which the State attributed to a threat from Bauer after a book with Bauer's name had been found in Ward's cell, with letters underlined to spell out "Ryan, don't say anything." The court denied the State's request to admit Ward's recorded statement to law enforcement to serve as testimony. But the court did allow Ward's girlfriend, Jessica Topham, to testify to as to what Ward told her about the night of the shootings as an excited utterance.

Topham testified that, the day after the shootings, Ward called and arranged to stay with her. She stated that Ward appeared "scared, worried, crying, [and] emotional." Ward recounted that LeTellier had shot May and that while Bauer had shot Darrell and Jordan, Bauer told him to "go finish Jordan off [be]cause he wasn't dead yet." Topham maintained that Ward was visibly

5

worried the whole time he was at her home.

LeTellier testified in great detail, providing further specifics of the night of the shootings. She reiterated that Bauer pointed his gun at her until she shot May. She stated that Bauer then shot May four more times.

Bauer, in contrast, testified that while he was present when LeTellier and Ward shot the Iversons and May, he did not plan or participate in the shooting. When the State asked Bauer why, if he was not involved, he did not shoot Ward or LeTellier after seeing them shoot the Iversons, Bauer responded, "the thought never crossed my mind." On redirect, Bauer continued on, noting that "I do not shoot people . . . I don't care if you hand me a gun or not, I'm going to put it down." When asked again why he did not pick up a gun and shoot Ward or LeTellier, Bauer stated, "I'm not going to shoot anybody."

In response, the State introduced rebuttal evidence that Bauer had committed an unrelated shooting the month prior. Bauer's ex-girlfriend, Alexandria Earley, testified that Ward contacted her requesting that she connect with a mutual friend to set up a meeting. She stated that she, Ward, and Bauer drove to meet this friend at a prearranged location, where Bauer lay in wait and then "shot at him." The court prohibited Bauer from cross-examining Earley about her relationship with Bauer and her own legal implications from this prior shooting. The State then recalled LeTellier to support Earley's testimony.

The State also introduced one of Bauer's Facebook messages to rebut "[Bauer's] multiple assertions that he would never shoot anybody." The message to an unrelated friend read: "I can shoot everybody and just say fuck it or not."

6

The State charged Bauer with three counts each of premeditated or felony murder committed in the course of a robbery. This included special allegations of aggravated murder under RCW 10.95.020. The State also charged firearm enhancements for each count and six counts of unlawful firearm possession and theft of stolen firearms. The court instructed the jury that it could find aggravated murder based on premeditated murder in the first degree or felony murder.

The jury convicted Bauer on all counts. Bauer appeals. The State cross-appeals.

ANALYSIS

Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). A court abuses its discretion if " 'no reasonable person would take the view adopted by the trial court.' " *Jennings*, 199 Wn.2d at 59 (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001). A misunderstanding of underlying law is necessarily an abuse of discretion. *State v. Meza*, 26 Wn. App. 2d 604, 609-10, 529 P.3d 398 (2023).

Rebuttal Evidence

Bauer asserts that the trial court improperly admitted extensive evidence of an unrelated shooting as rebuttal evidence. We agree.

We review a trial court's determination that a party has opened the door to otherwise inadmissible evidence for an abuse of discretion. *State v. Warren*, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006).

7

The open door doctrine " 'permits a court to admit evidence on a topic that would normally be excluded for reasons of policy or undue prejudice when raised by the party who would ordinarily benefit from exclusion.' " *Fite v. Mudd*, 19 Wn. App. 2d 917, 935, 498 P.3d 538 (2021) (quoting *State v. Rushworth*, 12 Wn. App. 2d, 473, 458 P.3d 1192 (2020)). So, when a defendant opens the door to an otherwise prohibited topic, the State may introduce relevant evidence in response. *State v. Lang*, 12 Wn. App. 2d 481, 487, 458 P.3d 791 (2020). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. But relevant evidence may be inadmissible if its probative value is substantially outweighed by the risk of unfair prejudice. ER 403.

Bauer repeatedly testified that he would not shoot someone, regardless of the circumstances. In doing so, he opened the door to allow the State to introduce relevant evidence to the contrary. Because the trial centered on whether Bauer shot three people, the trial court did not abuse its discretion in determining that evidence of Bauer's prior shooting was relevant evidence. It was not unreasonable to allow the State to cure the false impression that Bauer created with the jury. The issue arises, however, in weighing the probative value of the extent of the evidence against its prejudicial effect.

Earley's testimony extended far beyond the fact that Bauer had shot at someone before. In fact, Earley's testimony detailed Bauer's role as the "muscle" for a drug dealer and described how he organized a meeting with another drug

8

user who was behind on a debt, lay in wait, and shot at him. Instead of simply evidencing Bauer's willingness to shoot, the testimony created an image of Bauer as a hardened criminal, fully entrenched in the drug trade. In a trial centered on witness credibility, the prejudicial effect of the admission of the expansive surrounding statements outweighed any probative value they might have provided. Therefore, the trial court abused its discretion in admitting far more of Earley's testimony than was appropriate as rebuttal evidence.

### Drug-Trade Evidence

Bauer next asserts that the trial court erred in admitting evidence as to Bauer's involvement in the drug trade as propensity evidence. The State contends that the evidence was properly admitted as proof of motive, opportunity and knowledge under ER 404(b) and to complete the story under the doctrine of res gestae. Although the drug trade evidence is not propensity evidence, given that it does not establish Bauer's likelihood to commit the charged crime based on past acts, because the evidence is more prejudicial than probative and neither completes the story nor establishes motive, the trial court abused its discretion in admitting the testimony.

Again, evidence is relevant if it has any tendency to make a consequential fact more or less probable but inadmissible if its prejudicial effect outweighs any probative value. ER 401. Similarly, evidence of the accused's prior bad acts are inadmissible to prove criminal propensity. ER. 404(b). Such evidence suggests propensity if offered to show action in conformity with past crimes, wrongs, or acts. ER 404(b).

9

But otherwise inadmissible evidence may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). It may also be admitted as res gestae evidence, to " '[complete] the story of the crime charged or [provide] immediate context for events close in both time and place to that crime.' " *State v. Ta'afulisia*, 21 Wn. App. 2d 914, 938, 508 P.3d 1059 (2022) (quoting *State v. Sullivan*, 18 Wn. App. 2d 225, 237, 491 P.3d 176 (2021)). Res gestae evidence must be " 'a link in the chain' of an unbroken sequence of events surrounding the charged offense." *State v. Brown*, 132 Wn.2d 529, 571, 940 P.2d 546 (1997) (quoting *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981)). Res gestae evidence is not subject to the requirements of ER 404(b). *Ta'afulisia*, 21 Wn. App. 2d at 938.

Bauer asserts that the State introduced evidence of Bauer's role in the local "drug hierarchy" as propensity evidence to establish action in conformity therewith. The State contends that Bauer's role in that hierarchy was necessary both to "complet[e] the story" of the shootings and to establish Bauer's motive. Over Bauer's repeated objections, the court allowed the State to introduce extensive evidence about Bauer's general involvement in the drug trade, as well as specific details centering on a failed effort to send money to another drug dealer three weeks before the shootings. We conclude that while the evidence was not propensity evidence, the extent of the evidence is again more prejudicial than probative and it neither establishes motive, nor completes the story.

To begin, Bauer is incorrect in maintaining that the State introduced the evidence as propensity evidence. The State introduced evidence of Bauer's prior

bad acts as they related to the drug trade. As the introduced evidence did not include prior murders, the evidence does not present bad acts to prove conformity therewith. That said, the evidence is more prejudicial than it is probative because it continues the image of Bauer as a hardened criminal deeply involved in the drug trade while adding little relevant information. And because the evidence neither establishes motive nor completes the story, the trial court erred in admitting it.

The State attempts to establish that LeTellier's documentation of Bauer's drug use and Kyle Weed's testimony surrounding Bauer's attempt, and failure, to pay another drug dealer establish Bauer's motive for killing Darrell, Jordan, and May. But the State does little to actually connect this failed MoneyGram with Bauer's relationship to Darrell. In fact, LeTellier testified that she, Ward, and Bauer continued to use drugs with the Iversons up until the night of the shooting. And although law enforcement found firearms and other property belonging to the decedents in Bauer's home following the shooting, no evidence in the record establishes a drug-related conflict between the men. The State's knowledge of other evidence, including Ward's specific statement naming LeTellier's rape as motive, undercuts the story of a drug debt. The State's tentative theory, without any further connection beyond the fact that both Bauer and Darrell were involved in buying and selling drugs, is not enough to admit otherwise inadmissible evidence. The trial court abused its discretion in admitting the drug-trade testimony under ER 404(b).

As to the idea of "complet[ing] the story," similarly little evidence connects

11

Bauer's unsuccessful money transfer to an entirely separate drug dealer to the deaths of Darrell, Jordan, and May. Taking place three weeks prior to the shootings, which is notably a longer time frame than the time between LeTellier's rape and the shootings, Bauer's attempt to send money does not constitute a link in a chain of an unbroken sequence of events. Rather, the testimony creates a negative image of Bauer, potentially unrelated to the charged offense. Any probative value it might hold in relation to the shootings pales in comparison to its prejudicial effect. The trial court erred in admitting the drug-trade testimony under the res gestae doctrine.

Hearsay

Bauer asserts that the trial court's admission of inadmissible hearsay statements deprived him of a fair trial. We conclude that the trial court did not abuse its discretion in admitting Ward's first statement as an excited utterance but did err in admitting his second statement without hearsay exceptions for each level of hearsay in his statement.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Hearsay evidence is inadmissible except as provided by the rules of evidence, other court rules, or by statute. ER 802. And a number of exceptions exist. ER 803, ER 804. When a statement includes multiple levels of hearsay, each piece must fall under an exception to be admissible. ER 805.

1. Excited Utterance

Bauer asserts that the trial court erred in admitting Ward's statements to

Topham as an excited utterance because Ward was no longer under the influence of a startling event when he spoke to Topham. We conclude that, given the evidence provided, it was not unreasonable for the court to determine that Ward was still under the stress of the shooting when he spoke to Topham and therefore admit his statements as an excited utterance.

An excited utterance, or "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" does not qualify as inadmissible hearsay. ER 803(2). Courts reason that statements made under the stress of the event cannot be the result of "fabrication, intervening actions, or the exercise of choice or judgment." *State v. Carte*, 27 Wn. App. 2d 861, 883, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017, 542 P.3d 569 (2024). A party intending to admit a statement as an excited utterance must show that "(1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition." *Carte*, 27 Wn. App. 2d at 883. A statement is more likely to qualify as an excited utterance if the declarant is agitated or emotional, but such agitation or anxiety is not sufficient on its own. *Carte*, 27 Wn. App. 2d at 884.

Here, the trial court admitted Ward's statements to his girlfriend, detailing the events of the shooting, hours after it occurred. We conclude that the State clearly established the first and third factors required to introduce an excited utterance. The shooting itself certainly constitutes a startling event or condition. And Ward's statements that Bauer shot Darrell and Jordan and then requested

13

that Ward "finish Jordan off," relate clearly to that startling event. The remaining question is whether, five hours after the shootings, Ward was still under the stress or excitement of the startling event or condition when he spoke with Topham.

Topham testified that when Ward stepped into her car the morning after the shooting he was crying and visibly worried. She believed his emotions to be genuine and when she asked what was wrong, he recounted the events of the night before. Bauer objected to Topham's testimony, relying primarily on the time that had elapsed between the shooting and when Ward reconnected with Topham. Bauer suggested that there must have been intervening events in the four to six-hour period between the actual deaths and leaving with Topham. But Bauer did not provide any evidence of such intervening factors. Given the enormity of the startling event, the evidence of Ward's agitated or emotional state, the likelihood that leaving with Topham was the first time Ward had been away from LeTellier and Bauer since the shooting, and the lack of evidence of intervening events, it was not unreasonable for the court to allow the testimony. The trial court did not abuse its discretion in admitting Ward's statement to Topham as an excited utterance.

2. Multi-Level Hearsay

Bauer next asserts that the trial court erred in admitting Ward's statement to Topham under the coconspirator exception to hearsay because, while Bauer's statements to Ward were arguably made between coconspirators, when Ward told Topham, the statement was no longer in furtherance of a conspiracy. We

14

conclude that the trial court did abuse its discretion in admitting the testimony because Topham's account contained multiple levels of hearsay and the State failed to establish an exception for each level.

A statement is not hearsay if the statement is made by a coconspirator of the party during the course of and in furtherance of the conspiracy. ER 801(d)(2)(v). To be a coconspirator statement, the statement must "be made by a coconspirator, not to a coconspirator." *State v. Sanchez-Guillen*, 135 Wn. App. 636, 643, 145 P.3d 406 (2006) (emphasis omitted).

A statement is similarly not hearsay if the statement addresses "the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive . . .), but not including a statement of memory or belief to prove the fact remember or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." ER 803(a)(3). The use of "then" in the term "then-existing" refers to the time the statement was made, not the earlier time the statement describes. *Sanchez-Guillen*, 135 Wn. App. at 646. "Statements discussing the conduct of another person that may have created the declarant's state of mind are inadmissible under ER 803(a)(3)." *State v. Sublett*, 156 Wn. App. 160, 199, 231 P.3d 231 (2010).

In addition to testifying as to Ward's account of the night of the shootings, Topham testified that Ward told her Bauer asked him to return to the Iverson property to collect shells they had left behind. Bauer objected to the testimony, asserting hearsay. The court overruled the objection, determining that Bauer's statement to Ward fell within the bounds of coconspirator statements. But there

15

are two levels of hearsay involved in Topham's testimony: Bauer's statements to Ward and Ward's statements to Topham.

Although Bauer's statements to Ward do constitute coconspirator statements,[2] with both men involved in the shooting and the subsequent attempt at a cover-up, no evidence exists to suggest that Ward recounting Bauer's statements to Topham furthered the conspiracy between Bauer and Ward. Nothing in the record suggests that Ward relayed the information to Topham with the intent of eliciting her help retrieving the shells or involving her in the overall crime. Rather, as with Ward's initial statements placing blame on Bauer, it seems that Ward was continuing to tell a story that reduced his own culpability. Ward's statements to Topham do not fall under the coconspirator hearsay exception.

The State then contends that the statements are not hearsay because they expressed Ward's then-existing statement of mind. Ward's statements to Topham, the State maintains, were simply expressing his plan to go get the shells left behind. But Topham did not testify solely to Ward's intent to do so. Instead, she testified that Ward told her that Bauer told him he had to return to the property to retrieve the shells. Ward did not express any ownership of this "plan," but rather indicated that he had to follow Bauer's instructions. Bauer's conduct therefore created Ward's statement of mind. Accordingly, Topham's testimony was not excluded as hearsay under ER 803(a)(3).

---

[2] Bauer's statements to Ward are also admissible as statements by a party opponent. ER 801(d)(2).

Because no exception covers both levels of hearsay testimony, we conclude that the trial court abused its discretion in admitting Ward's statements to Topham as coconspirator statements.

<u>Sixth Amendment Right to Challenge Accusers</u>

Bauer contends that the court deprived him of his constitutional right to challenge his accusers in limiting his ability to cross-examine LeTellier and Earley about their potential biases. We conclude that the trial court did violate Bauer's Sixth Amendment right because the excluded evidence was at least minimally relevant, was not so prejudicial as to disrupt the fairness of the proceedings, and the State's reasons for exclusion did not outweigh Bauer's interests in cross-examination.

The Sixth Amendment to the United States Constitution and Washington Constitution article I, section 22 grant criminal defendants the right to present testimony in their own defense. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. The right to present a complete defense includes the right to confront and cross-examine adverse witnesses to expose bias. *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). We review an alleged violation of this Sixth Amendment right de novo. *State v. Jones*, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

"The trial court must provide the accused with 'a fair opportunity' to defend against the government's accusations." *Carte*, 27 Wn. App. 2d at 877 (internal quotation marks omitted) (quoting *Jones*, 168 Wn.2d at 720). The court may satisfy this right by allowing meaningful cross-examination. *Carte*, 27 Wn. App.

2d at 877. This right is not absolute, however, and the accused does not have a right to present evidence that is " 'incompetent, privileged, or otherwise inadmissible under standard rules of evidence.' " *Carte*, 27 Wn. App. 2d at 877 (internal quotation marks omitted) (quoting *State v. Lizarraga*, 191 Wn. App. 530, 533, 364 P.3d 810 (2015)). Also, the accused has no right to introduce irrelevant evidence. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

Evidence is relevant if it has any tendency to make the existence of any fact or consequence to the determination of the action more or less probable than it would have been without the evidence. ER 401. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *U.S. v. Abel*, 469 U.S. 45, 52, 105 S. Ct. 465, 83 L.ed.2d 450 (1984). The accused must be able to explore witness bias that "stems from a witness's motive to cooperate with the State based on the possibility of leniency or the desire to avoid prosecution." *Orn*, 197 Wn.2d at 352.

We apply a three-part test to determine whether the trial court violated the accused's right to confront a witness by limiting the scope of cross-examination, asking "(1) whether the excluded evidence was at least minimally relevant, (2) whether the evidence was 'so prejudicial as to disrupt the fairness of the factfinding process' at trial, and if so, (3) whether the State's interest in excluding the prejudicial evidence outweighs the defendant's need to present it." *Orn*, 197 Wn.2d at 353 (quoting *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983)).

18

Here, the court prohibited Bauer from cross-examining LeTellier about her efforts to withdraw her guilty plea, as well as from cross-examining Earley about her own legal implications in relation to the testimony she provided about Bauer's prior shooting.

1. LeTellier

The State introduced LeTellier as a witness to provide a description of the night of the shooting and Bauer's role in its planning and execution. She did so in great detail, from noting that Bauer and Ward left their cell phones at home before driving to the Iverson property to describing watching Bauer shoot May. But LeTellier's account of the night changed a number of times over the course of the months leading up to trial. LeTellier's initial statement denied any involvement in the shooting, placing all of the blame on Bauer and Ward. Her initial plea statement, however, took full responsibility for killing May. And it was not until Bauer proceeded to trial that LeTellier sought to withdraw that plea agreement, asserting, for the first time, that she only shot May because Bauer held a gun to her head. Despite acknowledging the changes to LeTellier's account, the court prohibited Bauer from cross-examining her about her attempts to withdraw her plea. The trial court erred in doing so.

LeTellier's credibility, as the only other witness at the scene who testified, is certainly at least minimally relevant to the overall question of Bauer's guilt. LeTellier's conflicting accounts of the night of the shooting mean that at least some of the versions were untrue. And the fact that LeTellier hoped to withdraw her plea and seek a rape trauma defense helps explain why the most recent

version of the story would minimize her own involvement and directly implicate Bauer.

Next, no evidence in the record suggests that questions about LeTellier's attempt to withdraw her plea would be so prejudicial as to disrupt the fairness of the factfinding process. The State contends that allowing Bauer to ask about LeTellier's attempt to revoke her plea paints the State in a bad light, suggesting some sort of "wink" deal with LeTellier based on her performance at trial. This would invite speculation, the State asserts, asking the jury to weigh LeTellier's credibility based on facts not in evidence. But the risk of painting the State in a bad light is not enough to establish that relevant testimony would be so prejudicial as to completely undermine fairness. And Bauer's need to present evidence of LeTellier's potential motivation to fabricate a new story outweighs the State's interest in protecting its reputation.

We conclude that the trial court erred in prohibiting Bauer from cross-examining LeTellier about her attempt to withdraw her plea deal.

2. Earley

The State introduced Earley as a witness to rebut Bauer's character evidence. She did so by detailing Bauer's prior misconduct unrelated to the charges at hand, depicting Bauer as a criminal. The court, however, prohibited Bauer from questioning Earley about the legal implications of her own involvement in that prior misconduct. This was error.

Evidence about Earley's motivation for testifying is relevant because it tends to show her interest in incriminating Bauer and minimizing her own

culpability. If Earley were to face charges for the same conduct she attributed to Bauer, it is logical that she would emphasize his role in an attempt to lessen her own.

And questions around Earley's own criminal behavior are not so prejudicial as to disrupt the fairness of trial. As with LeTellier, the State suggests that the evidence is too prejudicial because it indicates that the State was hiding an immunity deal. The State also pointed out that Bauer called his own witness to rebut Earley's testimony and therefore did not need to undermine her through cross-examination. But, again, the risk of potentially suggesting that the State is slightly underhanded is not enough to establish that relevant credibility testimony is too prejudicial to allow for a fair trial. Earley suggested to the jury that Bauer was the type of seasoned criminal who organized shootings based on drug debts. It would not have been unreasonably prejudicial to grant Bauer the ability to challenge that image by questioning the person suggesting it. Again, the State's interest in protecting its reputation is not enough to outweigh Bauer's need to undermine the credibility of key witnesses.

The trial court violated Bauer's Sixth Amendment right to challenge his accusers in limiting his ability to cross-examine LeTellier and Earley.

### Fifth Amendment Right to Silence

Bauer asserts that law enforcement violated his Fifth Amendment[3] right to silence when officers continued to interrogate him after he unequivocally invoked his right to an attorney. Bauer also asserts that such error is not harmless.

---

[3] U.S. CONST. amend. V.

Because Bauer unequivocally invoked his right to counsel, law enforcement violated his right to silence. And because the State did not prove beyond a reasonable doubt that no probability exists that the outcome of the trial would have been different had the questioning ended at Bauer's request, we conclude the error is not harmless.

We review questions of constitutional law de novo. *State v. TVI, Inc.*, 1 Wn.3d 118, 128, 524 P.3d 622 (2023).

1. Unequivocal Request

Before any custodial interrogation, law enforcement must inform a suspect that " 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning.' " *State v. Piatnitsky*, 180 Wn.2d 407, 412, 325 P.3d 167 (2014) (quoting *Miranda*, 384 U.S. at 479). Wavier of these rights must be knowing, voluntary, and intelligent. *Piatnitsky*, 180 Wn.2d at 412. "Even once waived, a suspect can invoke these rights at any point during the interview and the interrogation must cease." *Piatnitsky*, 180 Wn.2d at 412. But that request must be unequivocal. *Davis v. United States*, 512 U.S. 452, 462, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). If the request is not unequivocal, officers may continue questioning the suspect. Davis, 512 U.S. at 462.

A suspect's request for counsel is unequivocal if they articulate their desire with sufficient clarity such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

*State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 756, 294 P.3d 857 (2013). The Washington Supreme Court has held that " '[m]aybe [I] should contact an attorney' " or "I guess I'll just have to talk to a lawyer about it" are equivocal statements rather than an unequivocal request, but that " 'I gotta talk to my lawyer' " and " 'I'm gonna need a lawyer because it wasn't me' " are unequivocal requests for an attorney. *Gasteazoro-Paniagua*, 173 Wn. App. at 756 (alterations in original) (internal quotation marks omitted) (quoting *State v. Radcliffe*, 164 Wn.2d 900, 907-08, 194 P.3d 250 (2008); *State v. Nyasta*, 168 Wn. App. 30, 42, 275 P.3d 1162 (2012); *State v. Pierce*, 169 Wn. App. 533, 544-45, 280 P.3d 1158 (2012)).

Here, when placed in custody and asked to waive his *Miranda* rights, Bauer stated, "I'd rather not sign [the waiver]" and emphasized that he did not know what was happening. In response, Officer Jeff Waterhouse, who read Bauer his rights, reassured him that "constitutional rights . . . will never go away." Even if Bauer were to sign the waiver, Officer Waterhouse specified, he could assert any of his rights at any point during the interview. Bauer then stated, "I've found that usually people that start talking end up in kind of trouble, they don't even know what they're getting into so I'd much rather speak to a lawyer I think." Officer Waterhouse acknowledged Bauer's statement, saying "[o]kay, so you don't." But when Bauer reiterated that he did not know what the arrest was about, Officer Waterhouse continued to press on the waiver. Bauer eventually signed and responded to questioning without his attorney.

Bauer expressed twice, within minutes of being read his *Miranda* rights,

that he did not understand his arrest and that he did not want to waive his rights. This came in the form of three statements. Bauer first stated that he did not want to sign the wavier. His second statement, noting that he found that people who start talking usually end up in trouble, explained his desire not to sign the wavier. He then added that he would rather speak to a lawyer. That third statement, specifically stating that he would rather speak to a lawyer, followed directly on the heels of Officer Waterhouse affirming that he could assert his rights at any time. Including "I think" at the end of that sentence was, in this circumstance, simply a description of his current train of thought; unlike "I guess," which carries an association of uncertainty. Any reasonable officer would have understood that statement to be a request for an attorney.

In fact, Officer Waterhouse acknowledged Bauer's desire not to talk. Beyond the any reasonable officer standard, the record supports that Officer Waterhouse actually understood Bauer's request. Bauer unequivocally invoked his right to counsel. And because Officer Waterhouse continued the investigation after Bauer unequivocally invoked his right to counsel, law enforcement violated Bauer's constitutional right to silence.

2. Harmless Error

"A constitutional error is harmless if 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *State v. A.M.*, 194 Wn.2d 33, 41, 448 P.3d 35 (2019) (internal quotation marks omitted) (quoting *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002)). " 'An error is not harmless beyond a reasonable doubt when there is a reasonable probability

24

that the outcome of the trial would have been different had the error not occurred.' " *A.M.*, 194 Wn.2d at 41 (quoting State v. Powell, 126 Wn.2d 244, 267, 893 P.2d 615 (1995)). " 'A reasonable probability exists when confidence in the outcome of the trial is undermined.' " *A.M.*, 194 Wn.2d at 41 (quoting State v. Benn, 120 Wn.2d 631, 649, 845 P.2d 289 (1993)).

Bauer asserts that the State cannot prove the error was harmless beyond a reasonable doubt because, without the admitted statements to law enforcement, Bauer would not have felt the need to testify and the jury's assessment of credibility would have been far more limited. Bauer continues on to suggest that the statements he made in violation of his *Miranda* rights were critical to the State's case. Because beyond reasonable doubt is a high bar, the State does not establish that the outcome of the trial would not have been materially different absent an error.

Bauer told law enforcement that he traded tools and a couple of guns with Darrell in exchange for drugs, that he knew the people who lived at the Iverson property, details of his relationship with Darrell, and that he was working the night of the shooting. Bauer also provided details about LeTellier and Ward, noted specifically that he did not think Ward would be connected to the murders, and consistently denied that he himself was present the night of the shootings. This latter testimony, in particular, contradicted Bauer's later defense of mere presence. At no point elsewhere in the trial did Bauer assert that he was not at the Iverson property the night of the shooting. And the State highlighted this inconsistency in closing statements, referencing his interview with law

25

enforcement directly. Given that both parties relied primarily on the jury believing their witnesses over the other side's, any challenges to credibility were critical to the outcome of the case. Bauer's inconsistencies before the jury stemmed from inadmissible testimony. Because the State does not prove, beyond a reasonable doubt, that the outcome of the trial would not have been different absent the inadmissible statements, we conclude the error is not harmless.

<u>Aggravated Murder</u>

Bauer asserts that because the court informed the jury that they could find aggravated murder based on premeditated murder *or* the felony murder charge, his aggravated murder convictions are not authorized by law under RCW 10.95.020. Because the jury found Bauer guilty of premeditated murder and established the aggravating circumstances, we disagree.

We review challenged jury instructions de novo, evaluating the particular phrase in the context of the instructions as a whole. *State v. Harris*, 164 Wn. App. 377, 383, 263 P.3d 1276 (2011).

A person is guilty of aggravated first degree murder if they commit first degree murder as defined by RCW 9A.32.030(1)(a), and one or more aggravating circumstances exist. RCW 10.95.020. RCW 9A.32.030(1)(a) provides that a person is guilty of murder in the first degree when "with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person." A person is guilty of felony murder, in contrast, when "he or she commits or attempts to commit any felony . . . and, in the course of and in furtherance of such crime . . . he or she, or another

participant, causes the death of a person other than one of the participants." RCW 9A.32.050(1)(c). To find a person guilty of aggravated first degree murder, the crime must be "premeditated murder in the first degree (*not* murder by extreme indifference or felony murder) accompanied by the presence of one or more of the statutory aggravating circumstances." *State v. Irizarry*, 111 Wn.2d 591, 593-94, 763 P.2d 432 (1988).

Bauer asserts that because the court did not differentiate between premediated murder and felony murder in giving the aggravated murder jury instruction, there is no way to know that the jury relied on the correct charges in finding Bauer guilty. He relies on *Irizarry*, noting that aggravated murder under RCW 10.95.020 cannot be found based on felony murder and, if done, the conviction should be vacated. 111 Wn.2d at 595. But *Irizarry* is factually distinguishable because the defendant in that case was found guilty only of felony murder.

Here, although the court did provide an inaccurate jury instruction, the jury unanimously found Bauer guilty of both premeditated murder and felony murder, plus the aggravating circumstances. Accordingly, the jury met each requirement outlined by both *Irizarry* and RCW 10.95.020: the jury found the crime to be premeditated murder in the first degree, accompanied by the presence of one or more of the statutory aggravating circumstances. We conclude that Bauer's aggravated murder convictions were authorized by appropriate law and standards.

27

Cumulative Error

Bauer lastly asserts that, even if a single error alone is not enough to warrant reversal, the combined effects of all of the errors denied him a fair trial under the cumulative error doctrine. The State does not address Bauer's cumulative error claim. We agree with Bauer.

The cumulative error doctrine applies when " 'a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless.' " *State v. Azevedo*, 31 Wn. App. 2d 70, 85, 547 P.3d 287 (2024) (quoting *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014) (abrogated on other grounds by *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018)). "The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." *Cross*, 180 Wn.2d at 690.

Here, the trial court erred in admitting extensive inadmissible evidence, in admitting inculpatory hearsay statements, in including Bauer's custodial statements in violation of his *Miranda* rights, and in prohibiting Bauer from cross-examining key witnesses about their credibility. Given that the State's case rested on the jury believing LeTellier, Earley, and other state witnesses over Bauer, the cumulative errors substantially prejudiced Bauer and denied him a fair trial.

The State's inadmissible drug-trade evidence depicted Bauer as a hardened criminal, entrenched in the drug trade and capable of killing without

28

much thought. This image was then bolstered by Ward's inadmissible hearsay indicating that Bauer was in charge. Bauer's statements to law enforcement, which differed from his trial testimony, then created an image that he was a liar. Combined, this testimony prejudiced the jury against Bauer and undercut his defense of mere presence at the Iverson property. In prohibiting Bauer from cross-examining the two key witnesses establishing this image, the court then significantly limited Bauer's ability to challenge that portrayal. When combined, the trial court's errors denied Bauer a fair trial.

### Cross-Appeal

On cross-appeal, the State contends that the trial court erred in ruling that Ward's statements to law enforcement were inadmissible under ER 804(b)(6) and ER 803(a)(5). Because the State is not an aggrieved party under RAP 3.1 and its appeal of evidentiary rulings does not fit in the RAP 2.2(b) criteria, we decline to reach the cross-appeal.

"The standing of the State to appeal in a criminal case is limited by RAP 2.2(b)." *State v. Hawthorne*, 48 Wn. App. 23, 28, 737 P.2d 717 (1987). RAP 2.2(b) permits the State to appeal only in the following circumstances: (1) final decision, except not guilty; (2) pretrial order suppressing evidence; (3) arrest or vacation of judgment; (4) new trial; (5) disposition in juvenile offense proceedings; and (6) particular sentences in criminal cases. Any appeal outside of the RAP 2.2(b) criteria is not permitted. RAP 2.2(b).

Further, only an aggrieved party may seek review. RAP 3.1. Generally, a party is not aggrieved by a favorable decision. *Randy Reynolds & Associates,*

*Inc., v. Harmon*, 193 Wn.2d 143, 151, 437 P.3d 677 (2019).

Here, the State received a unanimous guilty verdict on all charged offenses. Accordingly, the State was not an aggrieved party below and therefore could not seek review. In addition, the State's appeal surrounding the admission of evidence does not fit any of the RAP 2.2(b) criteria. The first two criteria are the most applicable, but the State does not wish to appeal the final judgment, nor did the trial court suppress the evidence in a pretrial order. In addition, because we remand for a new trial, the admission of evidence will be a question for the trial court. The evidence at the new trial may not be the exact evidence argued initially.

We decline to reach the cross appeal and remand for a new trial.

_____
Smith, C.J.

WE CONCUR:

_____     _____